JACOB S. WINSLOW, and others, in Equity,

*vs.*

LEONARD C. YOUNG, and others.

Cumberland.    Opinion May 12, 1900.

*Tenants in Common.    Partnership.    Agency.    Contribution.*

One tenant in common, without authority from his co-tenant, cannot create a personal liability against him by making improvements on the common property, or payments in regard to it, as to which the co-tenant was not under a legal liability.    When the improvements add permanent value to the property, the tenant making them, if in receipt of the rents, may be permitted to hold them for his reimbursement; but his right to contribution extends no further.

The court will not decree a partnership to have existed when the parties did not intend to create one and its existence cannot arise as a legal inference from the facts.

Where trustees took a conveyance of land subject to an outstanding mortgage, which they personally agreed to pay, and holding the legal title upon a resulting, dry trust in favor of each individual owner, which the statute of uses would execute in his favor, and they removed the mortgage incumbrance by their voluntary payment of it in performance of their personal agreement, they are entitled to hold the property, or its proceeds under a sale by decree of the court, to the extent of their reimbursement; and will be accountable over to the other owners for the excess only.

Where such trustees voluntarily and unnecessarily assumed the mortgage on their individual responsibilities, and made other advances,—all without authority from the other owners,—their claim to reimbursement is limited to

the proceeds of the sales of the land; and they can only rely upon the land for reimbursement.

Upon a bill in equity seeking contributions for such voluntary payments the other parties may well say they did not desire redemption at a cost of more than double the amount realized from the sale of the property. *Held;* that no benefit resulted to them and no equity in favor of the trustees arises from the transaction.

In 1889, the plaintiffs and others purchased a tract of land at Sioux Falls, the several parties taking varying proportional interests. By tacit assent the title was taken by three of their number as trustees, but the deed contained no declaration of trust, nor the names of the beneficiaries.

There was never any agreement by the parties in interest, defining or limiting the trust, or the rights, powers or duties of the trustees, nor any declaration of trust by the trustees themselves. They held by what in law is termed a dry trust.

When the title was to be obtained, it was found that the land was subject to a mortgage for $45,000. The title was conveyed to persons agreed on as trustees, subject to that mortgage, which the grantees assumed and agreed to pay. *No authority had been given to them to assume that mortgage in behalf of the other parties interested, nor did they have knowledge of its assumption till long after, and it was never assented to by them.*

One mortgage note was paid from funds that had been paid in by the several parties taking interests in the purchase.

In 1896, these plaintiffs paid $27,676, the amount due upon the mortgage, which had been assumed by them, and upon a bill in equity sought contribution for this and other disbursements from the parties subscribing for interests in the property. No authority had been given for these payments by the parties sought to be charged, unless it was at a meeting of about one-half of the persons interested, held on December 30, 1890.

The original subscribers having previously declined to make further payments, it was then voted that the trustees " be authorized to call upon the proprietors for further payments," and that they " be authorized to raise any amount of money required to take up said mortgage which may not be paid by the part owners or proprietors, and to reimburse themselves from the first sales of land for all outlays, interest and expenses;" also that the trustees be authorized to sell all or any part of the land.

*Held;* 1. These votes were not binding upon the proprietors who were not present at the meeting, nor assented to by them:

2. That the parties taking interests were not partners:

3. That the trustees held the legal title upon a resulting, dry trust in favor of each individual owner, which the statute of uses would execute in his favor for his aliquot share of the estate in common and undivided. That this trust was not enlarged to an active trust by the action of a part of the cestuis que trust. That for all practical purposes, the action of a few at the December meeting became inoperative upon the trust estate or the powers and duties of

the trustees; *also*, that the votes were not binding upon the proprietors who were not present at the meeting, nor assented to by them :

4. The payment of the mortgage debt by the plaintiffs was voluntary, in performance of their personal agreement to assume and pay it. They are entitled to hold the estate bid in for them on its sale by decree of court to the extent of their reimbursement, and will be accountable over to the other owners only for the excess :

5. If the land is insufficient for this purpose, they have no claim for the deficiency upon the other owners.

ON REPORT.

This was a bill in equity, heard on bill, demurrer, plea, answers and proofs, brought to enforce contributions from the members of an alleged partnership or syndicate formed to purchase a certain tract of land in the city of Sioux Falls, South Dakota, known as the Phillips Avenue property.

The case appears in the opinion.

*B. D. and H. M. Verrill; J. W. Symonds, D. W. Snow, C. S. Cook and C. L. Hutchinson,* for plaintiffs.

Counsel argued: The legal effect of the arrangement which gradually developed between November, 1889, and the meeting held December 30, 1890, was that of a partnership. Where there is a community of interest in the subject matter of the enterprise, and an agreement to share in the profits, a partnership arises. *Doak* v. *Swann*, 8 Maine, 170; *Gilmore* v. *Black*, 11 Maine, 485; *Dwinel* v. *Stone*, 30 Maine, 384; *Banchor* v. *Cilley*, 38 Maine, 555; *Illingworth* v. *Parker*, 62 Ill. App. 650; *Robinson* v. *Parker*, 25 Wash. L. Rep. (D. C.) 497; *Hackett* v. *Stanley*, 115 N. Y. 625; *Buffum* v. *Buffum*, 49 Maine, 108; *Harding* v. *Foxcroft*, 6 Maine, 76.

A partnership exists when such a relation exists between two or more persons that each is as to all the others, in respect to some business, both principal and agent. "Agency test": *Cox* v. *Hickman*, 8 H. L. C. 268; *Bullen* v. *Sharp*, 1 C. P. 86; *Morgan* v. *Farrell*, 58 Conn. 413, p. 422; *Eastman* v. *Clark*, 53 N. H. 276; Sto. Part. § 1; *Seabury* v. *Bolles*, 51 N. J. Law, 103; *Harvey* v. *Childs & Potter*, 28 O. St. 319; *Farmer's Ins. Co.* v. *Ross*

*& Lennan,* 29 O. St. 429; *Beecher* v. *Bush,* 45 Mich. 188; 17. A. & E. Ency. 833, and cases cited.

"The legal entity theory of partnership" is practically recognized, though not affirmed, in *Meehan* v. *Valentine,* 145 U. S. 611, p. 623, citing with approval *Pooley* v. *Driver,* L. R. 5 Ch. Div. 458, p. 476. See Par. Part. p. 346; *Fitzgerald* v. *Grinnell,* 64 Ia. 261, p. 264; *Hosmer* v. *Burke,* 26 Ia. 253; *Chaffee* v. *Jones,* 19 Pick. 260; *Warner* v. *Smith,* 1 DeGex, J. & S. 337; *Meily* v. *Wood,* 71 Pa. St. 488; *Cross* v. *Nat. Bank,* 17 Kan. 336; *Robertson* v. *Corsett,* 39 Mich. 777, p. 784; *Roop* v. *Herron,* 15 Neb. p. 80.

Whether a partnership existed is an inference of law from the facts shown to have existed. - *Dwinel* v. *Stone,* 30 Maine, 384, p. 386; *Beecher* v. *Bush,* 45 Mich. 188; *Harvey* v. *Childs,* 28 O. St. 319; *Clark* v. *Eastman,* 53 N. H. 276; Par. Part. p. 60; *Chapman* v. *Hughes,* 104 Cal. 302; *Kelley* v. *Bourne,* 15 Ore. 476.

The parties seem really to have had in mind a sort of unincorporated company, each subscriber to have a certificate showing his interest in the concern, and it was contemplated and understood that these certificates might be transferred without dissolving the enterprise, and rendering an accounting necessary.

Such an unincorporated association formed for the purpose of carrying on a joint enterprise is by operation of law a partnership. *Smith* v. *Virgin,* 33 Maine, 148; *Frost* v. *Walker,* 60 Maine, 468; *Cronkite* v. *Trexler,* 187 Pa. St. 100; *Hoadley* v. *County Com.* 105 Mass. 519; *Machinists' Nat. Bank* v. *Dean,* 124 Mass. 81; *Phillips* v. *Blatchford,* 137 Mass. 510; *Walker* v. *Wait,* 50 Vt. 668; *Farnum* v. *Patch,* 60 N. H. 294; *Gwinn* v. *Lee,* 6 Pa. Sup. Ct. 646; *Clagett* v. *Kilbourne,* 1 Black, 346; *Kelley* v. *Bourne,* 15 Ore. 476; *Horner* v. *Meyers,* 4 O. L. D. (Sup. Ct. Cin.) 404.

Where two or more persons engage in a joint enterprise to buy and sell lands, a partnership is formed. *Dudley* v. *Littlefield,* 21 Maine, 418; *Staples* v. *Sprague,* 75 Maine, 458; *Richards* v. *Grinnell,* 63 Ia. 45; *King* v. *Remington,* 36 Minn. 15; *Simpson* v. *Tenney,* 41 Kan. 561; *Hyman* v. *Peters,* 30 Ill. App. 134; *Flower* v. *Barnikoff,* 20 Ore. 132; *Chapman* v. *Hughes,* 104 Cal. 302; *Nirdlinger* v. *Bernheimer,* 90 Hun, 290; *Jones* v. *Murphy,*

24 S. E. Rep. 825; *Cronkite* v. *Trexler*, 187 Pa. 100; *Hulett* v. *Fairbanks*, 40 O. St. 233; *Canada* v. *Barksdale*, 76 Va. 890; Lind. Part. p. 51; *Newell* v. *Cochran*, 41 Minn. 374.

This arrangement by which a partnership was formed is not within the provision of the statute of frauds. *Collins* v. *Decker*, 70 Maine, 23; 17 A. & E. Ency. 962, citing many cases; *Holmes* v. *McGray*, 51 Ind. 358; *Dale* v. *Hamilton*, 5 Hare, 369; *Fall River Whaling Co.* v. *Borden*, 10 Cush. 458. See also *Richards* v. *Grinnell*, 63 Ia. 45, reviewing the authorities, and *Hamilton* v. *Halpin*, 8 So. Rep. 739, (Miss.).

The partnership was not of such a nature that it was dissolved by the death of a partner, or by the transfer of his share. *Smith* v. *Virgin*, 33 Maine, 148, p. 156; *Kahn* v. *Smelting Co.*, 102 U. S. 641; *Kimberly* v. *Arms*, 129 U. S. 512.

That by a special agreement a partnership may continue undissolved by the death of a partner must be taken as settled. *In re Shaw's Estate*, 81 Maine, 207; *Phillips* v. *Blatchford*, 137 Mass. 510; *Wild* v. *Davenport*, 48 N. J. 128; *Wilcox* v. *Derickson*, 168 Pa. St. 331; *Duffield* v. *Brainerd*, 45 Conn. 424; *McNeish* v. *Hulless Oat. Co.*, 57 Vt. 317; *Blodgett* v. *Am. Nat. Bank*, 49 Conn. 9; *Tenney* v. *N. E. Protective Assoc.*, 37 Vt. 64.

Respondents are bound in equity to contribute to reimburse the complainants for the expenditures made by them to protect and preserve the property of the syndicate and the interests of its members.

The complainants having been justified in advancing the money required to protect and preserve the syndicate property, the respondents are bound to contribute to reimburse them. 17 Am. & E. Ency. Law, p. 1213, and cases cited; *Beck* v. *Thompson*, 22 Nev. 109; *McGrath* v. *Cowen*, 57 O. St. 385; *Blodgett* v. *Am. Nat. Bank*, 49 Conn. 9; *Betjemann* v. *Betjemann*, (1895,) 2 Ch. D. p. 474.

If any of the respondents in the case at bar are insolvent or have removed without the jurisdiction of the court, the complainants are entitled to recover from those remaining contribution for the whole

amount due.　*Whitman* v. *Porter*, 107 Mass. 522, citing *Cary* v. *Holmes*, 16 Gray, 127.

A resulting trust arose at the time of the taking of the title to the property of the syndicate by the trustees and upon payment of the purchase money therefor.　*Dyer* v. *Dyer*, 2 Cox, 92; 1 Lead. Cas. in Equity, 165–203; *Baker* v. *Vining*, 30 Maine, 127; *Gilpatrick* v. *Glidden*, 81 Maine, 137.

An express trust was created by the deed of Pettigrew to the two parties named as trustees and further evidenced by letters and other forms of declaration signed by the trustees.

The deed naming the parties as trustees would appear to comply with the requirements of the statute of frauds.

Whether the trustees were such by appointment under an express trust or by virtue of a resulting trust makes no difference as to their rights and duties in this case.

The principle of contribution: *Dering* v. *Winchelsea*, 1 L. Cases in Eq. p. 78; 1 Pom. Eq. Jur. (Ed. 1892) § 411.

There is a distinct analogy between the case at bar and the cases where one of several co-owners or tenants in common of certain property incurs expense in the removal of an incumbrance on this property.　*Kites* v. *Church*, 142 Mass. 586; *Hurley* v. *Hurley*, 148 Mass. 444; *Leach* v. *Hall*, 95 Ia. 611, p. 619; *In re Devlin's Estate*, 17 Pa. Co. Ct. 433, (Orp. Ct.); *Moon* v. *Jennings*, 119 Ind. 130; 7 A. & E. Ency. of Law (2nd Ed.) 353, and cases cited.

This burden of contribution follows the share or interest of each party in the syndicate, continuing as long as such share or interest exists.

*J. A. and I. S. Locke; H. R. Virgin and F. C. Payson; J. W. Manson ʼand G. H. Morse; Edward Woodman; Jas. C. Fox; P. H. Gillin and H. J. Preble; and J. O. Bradbury,* for defendants.

*Messrs. Locke and Locke* for Clark, Gilman and John J. Gerrish argued that the full amount of $140,000 was not subscribed, and this is a condition precedent as stated by their own witness, Gerrish, and not contradicted, and thus a fraud was perpetrated upon these respondents by these plaintiffs.

Certain concessions were granted and advantages obtained by Gerrish and others while these respondents had a right to, expect that they were interested, dollar for dollar, and on the same basis proportionately as themselves. Such benefit and advantages so obtained, the principles of equity will not allow them to retain. *Emery* v. *Parrott*, 107 Mass. 95–100.

No agreement was made for a meeting of the associates or of those who had agreed to pay their money, and no meeting of those so agreeing was ever holden. Their individual agreement did not constitute them an association. *Cheney* v. *Goodwin*, 88 Maine, 568.

This bill is multifarious and unreasonable. *Wilcox* v. *Arnold*, 162 Mass. 577. " A syndicate agreement which merely provides for raising money to purchase certain lands at a given price, without any provision for selling the lands and dividing the profits, does not constitute a partnership agreement." *Ferguson* v. *Gooch*, 94 Va. 1, (40 L. R. A. 234).

In *Irvine* v. *Fobes*, 11 Barb. 589, the court say : " So, the members of a telegraph company by the articles of association of which the promoter was authorized to receive subscriptions to capital stock, and if a subscriber failed to pay he forfeited his stock and became liable to an action at law or bill in equity for any deficiency, the property of which was to be vested in trustees, are not partners, but tenants in common, of the property and franchises of the company, and the majority cannot bind the minority unless by special agreement." *Leach* v. *Harris*, 2 Brewst. (Pa.) 571; *Dwinel* v. *Stone*, 30 Maine, 386 ; *Knowlton* v. *Reed*, 38 Maine, 249 ; *Woodward* v. *Cowing*, 41 Maine, 9 ; *Millett* v. *Holt*, 60 Maine, 169-171.

One of several persons uniting in an enterprise for the purchase of land which proves unsuccessful cannot claim repayment for advances from others because of a clause in the agreement providing for repayment of all sums advanced by him, as, in the absence of agreement, such clause will be considered to mean repayment out of the proceeds. *Bell* v. *McAboy*, 3 Brewst. (Pa.) 81.

In *Ferguson* v. *Gooch*, 94 Va. 1, the court declares : " A purchase of lands by real estate agents on behalf of a syndicate, of which they are members, when the agents are also secretly acting

as agents of the vendor, cannot be enforced against the other members of the syndicate." See also *Farnsworth* v. *Hemmer*, 1 Allen, 494.

Promoters are jointly and severally liable for false representations if they are all acting together for a common object. *Hornblower* v. *Crandall*, 78 Mo. 581; *Gelty* v. *Devlin*, 54 N. Y. 403; *Chandler* v. *Bacon*, 30 Fed. Rep. 538.

If the owner of the property assists the promoter in making a secret profit out of the transaction, the contract may be rescinded against him. *Atwool* v. *Merryweather*, L. R. 5 Eq. 464, note, 37 L. J. Ch. 35; *New Sombrero Phosphate Co.* v. *Erlanger*, L. R. 5 Ch. Div. 73; 4 Cent. L. J. 510; *Cortes Co.* v. *Tannhauser*, 45 Fed. Rep. 730; *St. Louis & U. S. Min. Co.* v. *Jackson*, 5 Cent. L. J. 317.

*Mr. Woodman*, for Young and estate of James Webb, having demurred to the bill for the last named, argued in support of the demurrer. Tate has never been released from his obligation to contribute $10,000 to the supposed partnership, nor from his liability to discharge the mortgage of $45,000, subject to which the real estate was purchased.

Furthermore it appears that Pettigrew, the person by whom the real estate in question was conveyed to the trustees, conspired with said Tate and Gerrish to misrepresent the value and the amount of the purchase price of the land purchased by the trustees, so that Tate was chargeable not merely on account of the obligation assumed by him to defray the mortgage subject to which the property was purchased, and on account of his agreement to contribute $10,000 to the joint purchase, but also as one of the parties to the fraud practiced in effecting the sale of the land by Pettigrew to the trustees.

Statute of Frauds: *Smith* v. *Burnham*, 3 Sum. 435; *Larkin* v. *Rhodes*, 5 Porter, (Ala.) 195; *Benton* v. *Roberts*, 4 La. Ann. 216; *Clancy* v. *Craine*, 2 Dev. Eq. (N. C.) 363; *Williams* v. *Gillies*, 75 N. Y. 197.

No partnership was in fact formed. Changes cannot be made in the personnel of a firm without the consent of all the partners.

If a partnership had in fact been formed, the death of each of the three who died worked a dissolution of the partnership, and the attempts of the living partners to substitute other persons in their places were wholly inoperative and of no effect unless accomplished with the knowledge and consent of all.

Not a particle of evidence can be found in the record showing that any one of the defendants requested these "Trustees" to make any expenditure whatever beyond the amount with which they had been furnished by the several subscribers, or agreed to reimburse them in whole or in part for such expenditures as they might make.

The plaintiffs' statement of account in their bill is misleading, and in other respects their bill is disingenuous and insincere.

In cases of Chapman and Dyer the subscriptions were paid either wholly or in part by transfers of property of uncertain value to Gerrish, the promoter, who in turn directed that the amount agreed upon as the price of the property should be credited by way of transfer from his own paid up interest, an interest which represented no cash contribution to the enterprise whatever, but only Gerrish's own commissions or profit in the transactions. That is, these plaintiffs purchased from Gerrish an interest in his commissions, and were credited with the amount of such purchase, although the "Syndicate" received no benefit or advantage or contribution of money on account of the transaction.

The plaintiffs in their bill have misrepresented the amounts of their own subscriptions; they have concealed the fact that their subscriptions were paid in part by transfers of property to the person whom they themselves represent as a swindler imposing upon all, from which transfers the "Syndicate" derive nothing; they have misstated the true amount due them in their account, and they have misrepresented the nature of the sale by which the property was finally disposed of, concealing the fact that they themselves were the purchasers at that sale. Their assertion of a partnership is an afterthought and a mere pretense; at the time of making the advances, on account of which they now seek contribution from the defendants, they looked to the property to secure

their advances, regarding it as of sufficient value to protect them from loss. The property is in fact of sufficient value to reimburse them for all advances and yield a profit. They are the owners of the property to-day; let them rely upon it to make them whole.

All of plaintiffs' witnesses are parties to this action, and the material part of their testimony, so far as it touches the interests of Webb's estate was as to matters prior to his death and is inadmissible under the provisions of R. S., c. 82, § 98.

*Mr. Manson,* for defendant Fuller, argued: Gerrish was offering and selling this land to each party in individual interests. They were not buying with a joint fund as joint owners. They did not make up so much money and pay for the land, each owning a joint interest proportionate to the amount of money each subscribed.

All of these purchasers considered themselves at liberty to buy or sell their interests whenever they saw fit. They never promised to pay any one but Gerrish anything, and their promises to Gerrish were not negotiable, and if assignable have never been assigned, and could not except subject to existing equities.

The deal arose without any joint interest in buying, without any common fund, without any common method of coming into ownership, each one paying in whatever he could best trade with Gerrish, and being placed on the books as an owner of so much according as Gerrish represented.

Every dollar's worth of liability sought to be imposed on any one of the respondents was unauthorized and every dollar expended was without the consent and without the knowledge of most of the parties now asked to contribute.

How did these trustees get the authority to accept a deed carrying with it $45,000 liability and impose such a liability on any one?

It cannot be implied that because the investors consented that a deed to certain real estate should run to them or should run to them subject to a mortgage, that they should have authority to give or create a personal obligation of the investors or by any act make the investors personally liable.

There was not any prior authority to accept such a deed. There is no evidence that the respondents ever knew 'that the trustees had pretended to assume such authority until this action was brought.

This was not a general trading partnership and one partner could not bind another to a personal liability not contemplated by him. *Bank* v. *Noyes*, 62 N. H. 35; *Huckabee* v. *Nelson*, 54 Ala. 12; *Baldwin* v. *Burrows*, 47 N. Y. 199.

The rule that the mortgagee can hold the grantee of the mortgagor is an exception to the general rule which can only apply when the conditions above described ˙exist, only when the grantor could enforce payment from grantee, and subject to the equities between the grantor and grantee. So that in this case the mortgagees could never have had any rights against Fuller, nor can these complainants pay the mortgage as they did and enforce it against Fuller. *Garnsey* v. *Rogers*, 47 N. Y. 233; *Huebsch* v. *Scheel*, 81 Ill. 281; *Gaffney* v. *Hicks*, 131 Mass 124.

SITTING: EMERY, HASKELL, WISWELL, STROUT, SAVAGE, FOGLER, JJ.

STROUT, J. In the autumn of 1889, Theodore Gerrish, acting as the agent for R. F. Pettigrew, of Sioux Falls, proposed to form a syndicate to purchase a tract of land on Phillips Avenue, in Sioux Falls, at the price of $140,000.

He presented his scheme to certain gentlemen in Maine who are parties to this bill. He represented that fabulous profits were to be realized from the transaction; that one-half of the purchase price could remain on mortgage at eight per cent interest for one and two years, and that probably sales of the land would be sufficient to extinguish the mortgage debt before its maturity. Under these representations the parties defendant, except Fuller, agreed with Theodore Gerrish to take interests in the purchase. The extent of these interests were in most cases measured by specific sums of money, and not in fractions. But in the case of Clark, his written contract with Gerrish was for five fifty-sixths of the purchase. The contract with all other Eastern takers was verbal.

A part of those taking interests paid in full for their several shares—others paid in part—but all the purchases were treated as of November 1, 1889. If payments were made later, interest was added from that date at eight per cent.

Theodore Gerrish suggested, perhaps with the knowledge and assent of some of the parties, certainly not all, that Chapman should act as cashier or treasurer. Some of the parties made payments to him; but the majority arranged with Gerrish personally, and he directed Chapman what interest to allow to each. So it was at Gerrish's suggestion without express assent of any other party, except Clark, that the title was taken by Winslow, S. C. Dyer and Tate as trustees. Pettigrew made his deed of the property to them on November 22, 1889, recorded June 9, 1890. The deed does not contain the names of the cestuis que trust, nor any declaration of what the trust was; nor·was there ever any agreement among the parties defining or limiting the trust, and the rights, duties and powers of the trustees. They held the legal title under a dry trust, with no active duties in regard to it.

No objection appears to have been made subsequently by any of the parties to the conveyance to the trustees, nor is any made now. In his answer, Young says he was solicited by Theodore Gerrish to buy one undivided twenty-eighth part of the real estate, and that he. so agreed with Gerrish. John J. Gerrish, Preble and Webb say the same as to their interests.

Clark, as shown by his written agreement with Gerrish, understood that he was buying five fifty-sixths of the tract.

They all say, and it is not denied, that it was a condition of their undertaking that the whole $140,000 should be taken and subscribed before the agreements to take interests should be binding. It is admitted by the plaintiffs that that amount was never raised. Although the moneys received by Chapman and Theodore Gerrish were applied to the purchase of the property, it does not appear that the parties defendant knew that $140,000 had not been secured till long afterwards.

When the title was to be obtained from Pettigrew, it was found that the land was under mortgage to Artemas Gale, to secure the

payment of two notes, one for $25,000 and the other for $20,000. The title was conveyed to Winslow, Dyer and Tate, as trustees, subject to that mortgage, which the grantees assumed and agreed to pay. No authority had been given to them to assume that mortgage in behalf of the other parties interested, nor do the other parties appear to have had knowledge of its assumption till long after; and it was never assented to by them. No meeting of the several takers of interests was ever held till December 30, 1890, nor any general understanding or arrangement made as to management or sale of the property.

Such application of the money in hands of Chapman and Theodore Gerrish was had, that the twenty-five thousand dollar mortgage note was paid therefrom in September, 1891.

In May, 1892, the Chapman Banking Company bought the Gale mortgage, on which the twenty thousand dollar note remained due, and had it assigned to Charles J. Chapman, who subsequently commenced proceedings to foreclose. Pending these proceedings, the trustees Winslow and Dyer having discovered what was before unknown to them or any of the Eastern parties, except Theodore Gerrish, that of the $140,000 given as the price of the land, $50,000, was to go to Theodore Gerrish, Tate, Pettigrew and Milliken, as bonus and commissions, the various subscribers declined to make further payments under their several agreements; and Winslow and Dyer, as trustees, instituted legal proceedings in South Dakota to eliminate Tate, Pettigrew and Milliken from interest in the property, and to close the trust and sell the property. They obtained a decree for sale, and under it sold the property in 1896, for $12,000; but it is admitted that this sale brought no money, and that it was in fact bid in for the trustees, who have or can have a deed of it without payment of anything. Before this, Tate had conveyed his interest in the property to Winslow and Dyer, the two other trustees; but the other owners of interests in the land had no knowledge and gave no consent to the release of Tate as trustee.

In May, 1896, these plaintiffs paid $27,676, the amount due upon the Gale mortgage which with other payments by them, or

by Winslow and Dyer, trustees, made an outlay of $34,777.78 in excess of moneys received, including the $12,000 for which the property was bid in, as a cash asset. Plaintiffs do not claim that they had any express authority from their co-purchasers to make these advancements upon their account, except such as was given in the meeting of December 30, 1890, the only meeting when a quorum was present, or any action taken. At that meeting a part of the subscribers were present, not all. The evidence, which rests in recollection only, shows about one-half of the members present. At that meeting it was voted that the trustees "be authorized to call upon the proprietors for further payments," and that they "be authorized to raise any amount of money required to take up said mortgage which may not be paid by the part owners or proprietors, and to *reimburse themselves from the first sales of land for all outlays, interest and expenses."* Also, that the trustees be authorized to employ agents at Sioux Falls, to sell all or any part of the land at such prices as they consider for the interest of all.

Chapman kept some sort of record or memoranda, not produced, of the holdings of the various parties in the Phillips Avenue syndicate, as it was called; but nearly all of his entries appear to have been made at the suggestion or dictation of Theodore Gerrish. Folsom is entered as taking $10,000, at Gerrish's suggestion, but Folsom never consulted with any of his associates, nor was consulted by them in regard to it. He attended no meeting, answered no letters, and never showed any interest in the scheme. So J. J. Gerrish, having agreed to take an interest of $4500, and having paid $2250 on it, a little later Theodore Gerrish directed Chapman to transfer that share to the defendant Fuller, apparently as collateral for Theodore Gerrish's debt to Fuller. Various other peculiar transfers were made in the memoranda of Chapman, some of which are not very satisfactorily explained.

The grade of Phillips Avenue having been changed, to the damage of these lots, as the trustees believed, they desired to commence proceedings to recover compensation; and to that end asked the parties to sign a written agreement to unite to enforce the claim, and to pay pro rata to Chapman the expense of its prosecution, and

authorizing Winslow and S. C. Dyer, two of the trustees, to proceed. This was in November, 1894. The paper was signed by Winslow, S. C. Dyer, Chapman, Lowney and Young; but eight other parties in interest declined to be responsible for any part of the expenses, but did authorize the trustees to prosecute, holding them exempt from expense; and in the case of Mrs. Webb, where it was necessary that she should take letters of administration in South Dakota, Winslow and S. C. Dyer gave her a written guaranty to pay the expense of obtaining such letters, and to hold her harmless from costs or damages arising from prosecution of the claim.

The business was done very loosely. So little of it is in writing and so much rests upon uncertain recollection that it is very difficult to ascertain the precise facts, but we have extracted from the mass of evidence all that appears to be necessary to determine the legal and equitable rights of the parties.

The bill is brought to recover from the defendants, in the proportion of their holdings, the amount of advances by plaintiffs in excess of their receipts. It is ably argued that the true relation of all the parties was that of partners in a business to be conducted by the trustees. It is not claimed, nor is it shown, that the parties agreed upon or understood that they were forming a partnership in the ordinary manner by mutual consent; but it is claimed that the business or venture undertaken, and the means to accomplish it, and the method of raising funds therefor were such as to make it in law a partnership; and that the trustees, as holding the legal title and managing the property, were the agents of all the parties, and that what they did for the common interest of the concern was binding upon all.

It may be conceded that, under some circumstances, associated parties may be regarded in law as partners, when the parties themselves do not understand that a partnership exists. But before the law will imply such relation, contrary to the intention of the parties, it must appear not only that funds were contributed to a common object, but that the enterprise or business contemplated and intended to be carried on, is of such a character and purpose that

it cannot result in a successful issue if the proprietors are treated as tenants in common and not co-partners. As in *Farnum* v. *Patch*, 60 N. H. 294, where various persons took shares as stockholders for the purpose of starting and operating a grocery store, and were held to be partners.

So it may be that a partnership can be created by parol, the business of which is to deal in real estate without violating the statute of frauds. The authorities do not agree upon this. The affirmative is held in *Williams* v. *Gillies*, 75 N. Y. 197, and a contrary view is held in *Smith* v. *Burnham*, 3 Sumner, 435. Assuming that such partnership may legally be created by parol, we are to examine the acts of these parties and apply the rules of law to them and determine therefrom whether their rights and liabilities are to be governed by the law applicable to partnership.

It is undoubtedly true that the purchase was speculative, and that the proprietors expected. their profits to arise from sales of the land. They did not contemplate building upon it or making other improvements, but simply to hold it for sale at advanced prices, which it was supposed would be obtained in a short time. There was therefore no necessity for a partnership to accomplish this end. Ownership as tenants in common was equally effective. The elements which justify a court in finding a partnership to result from the character of the business to be done are wanting.

One element of a partnership is a community of interest in the subject matter of it. But that alone is insufficient. Part owners of a ship are always treated as tenants in common and not as partners, though they have a community of interest in the ship, and share its profits and bear its losses in the proportion of ownership of each.

Another element is that each partner, from the relation itself, becomes the agent of all the others, having the jus disponendi of its property, and authority to bind the firm by contracts, within the scope of the business, and upon dissolution of the partnership by death of one of its members, the survivors become entitled to retain and dispose of the partnership effects for a settlement of its

affairs. *Dwinel* v. *Stone,* 30 Maine, 386; *Knowlton* v. *Reed,* 38 Maine, 250; *Berthold* v. *Goldsmith,* 24 How. 541.

In the present case, while there was community of interest, there was no element of agency in the individual parties. This objection might be met and overcome if, by agreement of all the proprietors, the title had been taken by the trustees under an active and defined trust to manage and dispose of the property. But this was not the case.

The title was taken by Winslow, S. C. Dyer and Tate, as trustees, without the knowledge of most of the parties; and although later when it came to their knowledge no objection was made,— and all parties may therefore be regarded as acquiescing in that action,—there never was any declaration of trust by the trustees; nor did the proprietors ever confer upon the trustees any authority to manage or dispose of the property. They held the legal title to the land upon a resulting, dry trust in favor of each individual owner, which the statute of uses would execute in his favor for his aliquot share of the estate, in common and undivided.

We do not overlook the meeting on December 30, 1890, at which some, but not all, of the proprietors were present, and voted to authorize the trustees to raise money to discharge the mortgage, and reimburse themselves from sales of land, and to sell part or all of the land. There is no evidence that the proprietors not present at that meeting ever assented to its doings, or had knowledge of them; consequently the authority there attempted to be given bound only those voting, and did not affect the others. It was therefore impracticable for the trustees to act under that vote.

They could not sell and convey any specific portion of the land, but only the undivided interest of those voting or assenting to the vote. The resulting trust could not be enlarged to an active, managing trust by the action of a part only of the cestuis que trust. So that, for all practical purposes, this action of a few became inoperative upon the trust estate, or the powers and duties of the trustees. While they continued to hold the legal title, they were not authorized to make a price upon the whole or any part of the land or sell it, except upon the request of all the proprietors and

on the terms they might suggest; nor had they the right to refuse to sell (except their own share) upon the terms dictated by all the others. They never became the agents of the proprietors to manage and dispose of the property.

When Winslow, Dyer and Tate took the title, a trust in the land resulted in favor of all who had paid towards its purchase, and we are satisfied from the evidence that all the parties so understood it. That Winslow and Dyer so understood it, is apparent from their statement in letter to Folsom on October 28, 1895, in which they say, "Owing to the fact that no declaration of trust was filed with the deed, the trustees were not authorized to act in any way for the owners."

Even if the payments of the several parties were regarded as payments to a common fund to purchase the property jointly, when the trustees took title without any trust declared by them or by the parties in interest and none was subsequently declared by agreement of all, the trust in Winslow and his associates resulted to the contributors in their several proportions, as an integral interest in the land and attached to it, and the individual owner could have compelled a conveyance of his individual share from the trustees if his share was fully paid—if not so paid, then upon payment of the amount due. Perry on Trusts, §§ 520, 521, 133; *Buck* v. *Swazey*, 35 Maine, 41.

Upon all the facts it is apparent that a partnership was not intended by the parties, nor can one result as matter of law. *Ferguson* v. *Gooch*, 94 Va. 6.

But plaintiffs claim contribution upon another ground: that regarding the rights of the cestuis que trust as those of equitable tenants in common, the plaintiffs have advanced a large sum to protect the property, and for the benefit of all; and therefore the loss should be borne pro rata by all.

To the maintenance of this claim there are formidable obstacles. While the proprietors intended that one-half of the purchase money could remain on mortgage, nothing in the case indicates that they contemplated a mortgage creating a personal liability, but rather that the land alone should be responsible. It is true the matter

was not discussed—the parties saw only prospective profits, and possible loss was not thought of. The trustees when they took title found it incumbered with the $45,000 mortgage. If they had taken title subject to the mortgage—in other words—taken title to the equity, it would have been practically in accord with the understanding of the parties. Instead, they reluctantly assumed and agreed to pay the mortgage, thus rendering themselves personally liable. They had no precedent authority from the other owners to do this; and the fact that it was done was not known to them for some years afterward and was never ratified by them. It was not known at the meeting December 30, 1890, when action was taken by part of the owners, really looking to payment of the $25,000 note then due rather than the $20,000 note which did not fall due till a year later. The plaintiffs understood this, for when in May, 1896, they paid the last mortgage note which the trustees had personally assumed without authority, they did not consult the other owners or seek any direction from them in the matter.

This appears in Mr. Chapman's testimony. It is true, he had endeavored with but little success to collect unpaid subscriptions, and in October, 1895, made an effort to get a meeting of the parties to take the matter into consideration, but less than a quorum attended and nothing was done. At the December meeting, 1890, those who acted only authorized the trustees to raise money, not paid by the owners to take up the mortgage "and to reimburse themselves from the first sales of land for all outlays, interest and expenses," thus carefully avoiding the assumption of personal liability.

As to these parties, the plaintiffs must be regarded as acting under the limitations and conditions of the vote, and cannot claim personal liability; and as to all the others, they have no authority whatever.

So far as any general equity for contribution ex equo et bono may be considered, it must be remarked that by the schedules in the bill a credit of $12,000 is given for proceeds of sale of the entire property under date of May 1, 1896, and on the same day plaintiffs charge payment of $27,676 to discharge the mortgage.

As the trustees had personally assumed the mortgage of their own volition, without authority from the other owners, they were obliged to pay it.    But when they ask contribution towards that payment, the other parties may well say they did not desire redemption at a cost of more than double the amount realized on sale of the property.    No benefit resulted to them, and no equity in favor of plaintiffs arose from the transaction.

Having paid the mortgage under their personal liability and made other voluntary advances, plaintiffs are entitled to hold the land bid in for them to the extent of their reimbursement, and will be accountable over to the other owners only for the excess.    If the land is insufficient for this purpose, they have no claim for the deficiency upon the other owners.    They voluntarily and unnecessarily assumed the mortgage on their individual responsibility, and made other advances without any authority from many of the owners, and authority from a few, limited to reimbursement from sales of the land, and they can only rely upon the land for reimbursement.

One tenant in common, without authority from his co-tenant cannot create a personal liability against him by making improvements on the common property, or payments in regard to it, as to which the co-tenant was not under a legal liability.    When the improvements add permanent value to the property, the tenant making them, if in receipt of the rents, may be permitted to hold them for his reimbursement; but his right to contribution extends no further.    *Williams* v. *Coombs*, 88 Maine, 183; *Preston* v. *Wright*, 81 Maine, 306; *Alden* v. *Carleton*, 81 Maine, 358; *Calvert v. Aldrich*, 99 Mass. 74; *Converse* v. *Ferre*, 11 Mass. 326. These trustees have no greater right.

*Bill dismissed with one bill of costs.*